**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| ALBERT LEE APPLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 4:08-cv-206-TWP-WGH |
| | ) | |
| ORANGE COUNTY SHERIFF'S DEPT., | ) | |
| SHERIFF RICHARD DIXON, in his official | ) | |
| capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

This civil rights action is based on events that occurred October 11, 2007.  On that date, defendants Chief Deputy Babcock and Detective Lynch, members of the Orange County Sheriff's Department, responded to a tip that an illegal methamphetamine laboratory ("meth lab") existed in the woods of Leipsic, Indiana near Orleans. Their investigation ultimately lead them to a detached garage where plaintiff Albert Apple lived for a period of time. Chief Deputy Babcock and Detective Lynch discovered a meth lab in the garage and called Indiana State Police ("ISP") Sergeant Andry and Detective Magill to assist in their investigation. The garage was searched and items used in the methamphetamine manufacturing process were taken into custody. Ultimately, Apple was charged with manufacturing of methamphetamine in Orange County, Indiana.

Apple filed this lawsuit against officers of the Orange County Sheriff's Department and the ISP. He alleges that the officers violated his constitutional right to privacy. Specifically, Apple alleges he resided in his sister's garage and that the officers' entry into the garage without a search warrant and the subsequent discovery and seizure of items associated with the meth lab violated his Fourth Amendment rights. All defendants seek resolution of the claims alleged against them through summary judgment. Defendants, Richard Dixon in his official capacity as Sheriff of the Orange County Sheriff's Department, Detective Joseph Lynch and Chief Deputy Josh Babcock (collectively the "Orange County Defendants"), filed their motion for summary judgment on December 22, 2009, and defendants, ISP Officers Sergeant Paul Andry and Detective Rick Magill, filed their motion for summary judgment on January 6, 2010.   For the reasons explained below, the defendants' motions for summary judgment (dkt 45 and 55) must be **granted**.

## I. Summary Judgment Standard

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. Rule 56(c). A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." FED. R. CIV. P. 56(e)(2). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. See *Harney,* 526 F.3d at 1104 (citing cases).

"In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney,* 526 F.3d at 1104 (internal citations omitted). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## II.  Material Facts Not In Dispute

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Apple as the non-moving party. See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

*Methamphetamine*

The manufacturing and distribution of methamphetamine by an individual is a crime in the State of Indiana. The manufacturing of methamphetamine creates a danger to the health and safety of individuals involved in the process or located in proximity to the process due to the volatile nature of the combinations of products involved in the process.

*Orange County Defendants*

**Josh Babcock** has served as the Chief Deputy of the Orange County Sheriff's Department since May 2007. Prior to the position of Chief Deputy, Babcock was the Assistant Police Chief in Paoli, Indiana for approximately eleven years. Chief Deputy Babcock completed training to become an Indiana Certified Police Officer at the Indiana Law Enforcement Academy ("the Academy") in 1995.  He has received training on search and seizure procedures and the need for warrants to conduct a search unless one of federal exceptions to the warrant requirement are present.

In October 2007, Chief Deputy Babcock had over twenty hours of course training with regard to the detection and investigation of methamphetamines and had detected or investigated approximately 9 to 10 meth labs.  The meth labs Chief Deputy Babcock previously investigated contained odors that were similar to the odors he smelled coming from the Russells' garage. Chief Deputy Babcock was trained to know what that smell was and that it is a sign that a methamphetamine production operation is a probability.

**Joe Lynch** was a detective with the Orange County Sheriff's Department and held that position from October 2, 2007, until October 2, 2009. Detective Lynch is currently employed by the State of Indiana. Prior to working with the Orange County Sheriff's Department, Detective Lynch was employed by the West Baden Police Department.

Detective Lynch is a certified Indiana Police Officer and attended the Academy in Plainfield, Indiana in 1998. Detective Lynch received training regarding constitutional searches and on the detection and investigation of methamphetamine labs.  This training included attending Narcotics Interdiction, October 19, 1999, for two days (16 hours) and Clandestine Drug Lab Investigation in May, 2000, for one day (8 hours) and countless in-service training programs on drug investigation. Detective Lynch investigated approximately 10 meth labs prior to October 11, 2007, and in investigating each one he always smelled the same smell, which was present as he approached the Russells' garage.

*Indiana State Police Defendants*

**Sergeant Paul Andry** is employed by the Indiana State Police as a law enforcement officer. He has been with the Indiana State Police for over twenty-five years and is currently a Sergeant assigned to the Methamphetamine Suppression Section.

**Detective Rick Magill** is also employed by the Indiana State Police as a law enforcement officer.

Sergeant Andry and Detective Magill received training in how methamphetamine is manufactured and distributed in violation of state law and in the proper way to dismantle a meth lab. Sergeant Andry has substantial experience in conducting investigations involving the production of methamphetamine.

### October 11, 2007

Chief Deputy Babcock received an anonymous tip from someone who was bow hunting in the area of Leipsic, Indiana, who said he found what he believed to be a meth lab on the property he hunted.

Detective Lynch and Deputy Bill Fullington and Chief Deputy Babcock went to the area and met the bow hunter. While in the woods investigating what they believed to have been a meth lab, they found a cooler, "Liquid Fire", cold packs, a burnt spoon, and coffee filters, all of which are standard items involved in the manufacture of methamphetamines.

Near the meth lab in the woods, there was a path that led to a clearing in the vicinity of the home that was occupied by Albert Apple's sister, Amy Russell and her husband, Josh Russell. There are several residences in this area on the same side of the road as the Russells' home. Chief Deputy Babcock, Detective Lynch and Deputy Fullington walked around these homes and as they walked next to the garage that went with the Russells' trailer at 7861 North County Road 475 East, they smelled a strong ammonia odor. Detective Lynch and Chief Deputy Babcock's training and experience told them that type of odor was a strong indicator that there was a methamphetamine production operation going on somewhere in the near vicinity.[1]

---

[1] Apple argues that there could not have been an odor outside of the garage because "he had been locked up for a week and there could not possibly been any smell since there was no active meth-lab." This argument is insufficient to establish a material fact in dispute. The plaintiff was admittedly in jail at the time the Detective Lynch and Chief Deputy Babcock testified they smelled an odor indicating a meth lab was nearby. Thus, he was not in a position to personally dispute their testimony.

In addition, Apple states that Chief Deputy Babcock and Detective Lynch testified at their deposition in Apple's criminal case that when Chief Deputy Babcock opened the side door to the garage that he smelled strong odors. This alleged testimony is not inconsistent with their statements that they smelled the odor when they passed by the garage and again when they opened the garage door. Apple does not provide a citation to the record where these depositions can be found and the court was not able to locate them. "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (citing *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996)). Apple's unsupported argument is insufficient to establish a genuine issue of material fact regarding whether the officers smelled the odor associated with the production of meth as they passed by the Russell's garage.

***Consent***

Chief Deputy Babcock and Detective Lynch then approached the trailer and questioned Josh Russell and Amy Russell. They asked them if they knew anything about the meth lab in the woods and why there was a strong ammonia smell coming from their garage and they said they did not, but if anything was in the garage, it was all Apples'.

Josh Russell told Detective Lynch that "Albert Apple had been staying in the garage and I did not know what was in there because I did not go in there.  I let Albert stay in there if he helped out on the bills." (dkt 66-1).   Amy Russell told Chief Deputy Babcock that "Apple had agreed to help me on rent and some of the bills if he could stay there until he got on his feet.  Josh Babcock then asked me if he could search the garage.  At first I told him that Albert Apple, my brother, lived there and that he would have to ask him. Babcock kept persisting that I let him search, so I told him that I did not care what he did." (dkt. 66-2).

After Amy Russell told Chief Deputy Babcock that she did not care if he searched the garage, Chief Deputy Babcock went and opened the door of the garage.

It was clear to Chief Deputy Babcock that the Russells were the owners of the garage. Based on Chief Deputy Babcock's conversations with the Russells, he did not believe that Apple had exclusive possession and use of the garage. Even though the Russells indicated that they did not go in the garage once Albert moved in there, it was Chief Deputy Babcock's belief that they had the ability to do so, they just chose not to. The reason they had the ability to do so was the fact that they owned the property, including the trailer and the garage. Chief Deputy Babcock believed the Russells had personal belongings in the garage and used it as storage. In addition, it was Chief Deputy Babcock's understanding that Apple was not renting, was not on the lease, and had no Rental Agreement or Sublet Agreement with Josh or Amy Russell.

***The Garage***

Detective Lynch and Chief Deputy Babcock went over to the garage, opened the door and when they did so, were confronted with an even stronger scent or odor of ammonia. Detective Lynch and Chief Deputy Babcock immediately made the determination that this was a situation where a meth lab was involved and determined to call the Indiana State Police Drug Enforcement Unit to aid in processing the meth lab at 7861 N. County Road, 475 East, Orleans, Indiana. After Chief Deputy Babcock opened the garage door Chief Deputy Babcock did not further enter the garage and waited for the Meth Team led by Sergeant Andry.

According to Chief Deputy Babcock, the garage is approximately 20' x 20' x 20', having one side door and a single garage door. The garage door was unlocked when Chief Deputy Babcock opened it. Inside the garage, Chief Deputy Babcock saw an old bed, a wood stove, and other standard garage materials such as tools, storage materials and lawn

equipment. According to Chief Deputy Babcock, there was no division or segregation of the garage, it was all open and maybe a fourth of it looked like it could have potentially been used by Apple as a place to sleep. Apple's clothing and other personal effects including a savings account book and mail[2] were in the garage.

### Indiana State Police

Sergeant Paul Andry was the lead officer from the Jasper Post of the Indiana State Police who came to assist with the meth lab. Sergeant Andry arrived at the location with Detective Magill, who he had contacted to assist, and observed that the location had a mobile home and detached garage.

Sergeant Andry became aware that law enforcement had already gained initial entry into the garage and learned from Chief Deputy Babcock that the Orange County Sheriff's Department had obtained consent to search the garage from the owners of the property. This information was also relayed to Detective Magill.

The officers observed in the garage and outside through an overgrown area several items used in the methamphetamine manufacturing process. It did not appear to Sergeant Andry that someone was staying in the garage. Thereafter, they aided law enforcement on the scene in processing the meth lab, which involved collecting and itemizing items used in the manufacturing process.

### Meth Lab

Sergeant Andry has substantial experience with the recognition of meth labs, which includes recognition of the items used in the production process. There are different methods to make the illegal substance. Sergeant Andry observed several items (including a water cooler reaction vessel, HCL generator, coffee filters, Coleman camp fuel, a CVS cold pack package) that indicated to him that the Birch Reduction Method and the Red-P Method were being utilized in a specific way to produce methamphetamine in the garage. Items that can be used in the production of methamphetamine were photographed, cataloged, and/or disposed.

### The Russells

After the garage was searched, the Russells provided Chief Deputy Babcock and Detective Lynch with written statements. Amy Russell stated that 1) her brother, Apple, asked her to purchase Sudafed for him; 2) she had kicked Apple out of her house because she had seen needle marks on his arm; and 3) Apple had brought a friend of his, Lonnie Nelson, over and they talked about cooking meth to make extra money in the woods. Josh

---

[2] Mr. Apple's mail in the garage, was addressed to a different address than that of 7861 North County Road 475 East, Orleans, Indiana.

Russell stated that 1) Apple wanted Josh Russell to help him buy the items necessary to produce meth and that he told Apple no because he did not want to risk losing his kids; 2) right before Apple was arrested (on a violation of probation charge), he came to their house and was scared saying his skin felt like it was melting, on fire and smoke was coming from his forehead.

### Albert Apple

Chief Deputy Babcock and Detective Lynch went to the Lawrence County Jail to interview Apple on October 16, 2007. Apple had been incarcerated since approximately October 4, 2007. Apple was at the Jail on a probation hold for Petition to Revoke. Apple told Chief Deputy Babcock and Detective Lynch that Lonnie Nelson told him that he knew how to make meth and that Lonnie and Chris Jones were going to cook up a batch and they would split it with him if he would buy the pills needed and give them a place to cook it. Apple advised that the phosphorus meth messed up and the jar broke and messed up the batch.

Detective Lynch testified that the officers ran a check of the ephedrine logs, which showed that on October 1st, Albert Apple had purchased ephedrine at the Bedford Walgreens, Bedford Walmart and Mitchell CVS. Based on this information, Detective Lynch requested a warrant to arrest Albert Apple for dealing in methamphetamine and manufacturing under Indiana Code §35-48-4-1.1, a Class D Felony.

## III.  Discussion

Apple alleges that the defendants violated his Fourth Amendment rights by illegally searching the Russell's garage. The defendants argue (separately) that they are entitled to summary judgment for several reasons. First, Apple is without evidence to carry his burden of demonstrating that he had a reasonable expectation of privacy in the garage. Second, Chief Deputy Babcock and Detective Lynch were justified in entering the garage based on the fact that they had consent from an owner of the garage to search it.  Third, ISP officers relied in good faith upon the collective knowledge of law enforcement that consent for search of the garage had been obtained from the property owner when they proceeded to investigate the interior of the garage. Fourth, exigent circumstances existed necessitating entry into the garage in light of the safety risks to the public posed by the existence of the meth lab. Further, the defendants' actions are protected by the doctrine of qualified immunity because a reasonable officer would have believed that they had permission to search the premises as there was no clearly established law that prevented the search from occurring.

### A.  Qualified Immunity

The first issue to consider is whether the defendants are entitled to qualified immunity. *Bleavins v. Bartels*, 422 F.3d 445, 450 (7th Cir. 2005). This doctrine shields a government actor from further litigation unless the plaintiff can demonstrate (1) "the

violation of a constitutional right" that is (2) "clearly established at the time of the violation, so that a reasonable public official would have known that his conduct was unlawful." *Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002); *see Saucier v. Katz*, 533 U.S. 194, 200-02 (2001). As often occurs in these cases, our inquiry into the first prong of the qualified immunity paradigm requires that we assess the constitutional issue at the heart of the plaintiff's case. *Bleavins*, 422 F.3d at 450 (citing *Allison v. Snyder,* 332 F.3d 1076, 1078 (7th Cir. 2003)).

## B.  Fourth Amendment

Apple's claims are asserted pursuant to 42 U.S.C. § 1983, which provides that "[e]very person who, under the color of any statute, ordinance, regulation, custom or usage of any state . . . causes . . . the deprivation of any rights . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  Section 1983 is not itself a source of substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979). The initial step in any § 1983 analysis is to identify the specific constitutional right which was allegedly violated. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Kernats v. O'Sullivan,* 35 F.3d 1171, 1175 (7th Cir. 1994). Apple's claims implicate the Fourth Amendment to the United States Constitution.

It is well settled that searches and seizures inside a home without a warrant are presumptively unreasonable. *U. S. v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998). "The Supreme Court has stated that 'a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interests.'" *Bentz v. City of Kendallville,* 577 F.3d 776, 781 (7th Cir. 2009) (quoting *United States v. Chadwick*, 433 U.S. 1, 11 (1977)). Thus, to bring a Fourth Amendment action for an unlawful search a plaintiff must have a legitimate expectation of privacy that society recognizes as reasonable. *Bentz*, 577 F.3d at 781-82 (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *United States v. Sandoval-Vasquez*, 435 F.3d 739, 743 (7th Cir. 2006)).

The Fourth Amendment rule prohibiting the warrantless search of a person's house has two exceptions which are applicable to the circumstances alleged in this case. The first, recognizes the validity of searches with the voluntary consent of an individual possessing common authority over the property. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). "That person might be the householder against whom evidence is sought, . . . or a fellow occupant who shares common authority over property, when the suspect is absent, . . . and the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant."  *Id.* (internal quotations and citations omitted). The Supreme Court has explained that "common authority" is not synonymous with a technical property interest:

8

> "The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Georgia v. Randolph*, 547 U.S. 103, 110 (2006) (quoting *U.S. v. Matlock,* 415 U.S. 164, 171, n.7 (1974). The Seventh Circuit recently explained that someone has apparent authority if:

> "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) (internal quotation omitted); *see also United States v. Brown*, 328 F.3d 352, 356 (7th Cir.2003); *United States v. Jensen*, 169 F.3d 1044, 1049 (7th Cir.1999) ("The officers' reasonable belief that the person consenting to the search had authority to do so is all that is necessary for a consent search to be valid."); *United States v. Rosario*, 962 F.2d 733, 738 (7th Cir.1992) (noting that "the Fourth Amendment makes no insistence that the decisions of government agents always be correct. Police officers would be held to an impossibly high standard if expected to carry out their duties infallibly, and the courts have long recognized that mistakes will occur." (internal citation omitted)).

*U.S. v. Jackson*, 598 F.3d 340, 346 -347 (7th Cir. 2010). See also *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("[W]here a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents.").

The second exception occurs when probable cause and exigent circumstances exist. *U. S. v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998). Exigent circumstances exist when there is compelling need for official action and no time to secure a warrant. *Id.* at 482. "It is the government's burden to prove that its agents had an objectively reasonable belief that exigent circumstances existed at the time of the warrantless entry into the defendant's premises." *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir.1994). When determining whether exigent circumstances exist, "the court must analyze the situation from the perspective of the officers at the scene." *Id.*

### C.  Search of Russell's Garage

For the purposes of the defendants' motions for summary judgment, the court accepts Apple's view that he had a legitimate expectation of privacy in the garage in which he resided and that a warrantless search of the garage took place without his permission. The question then is whether the Orange County Defendants had obtained consent to

search the garage. The search was proper if Amy Russell gave her voluntary consent and if she is an individual possessing common authority over the garage. Ms. Russell had authority to consent to the search if: (1) she had joint control of or access to the garage; or (2) if it was reasonable for police to believe she had joint control of or access to the garage. See *U.S. v. James*, 571 F.3d 707 (7th Cir. 2009).

Because there is no evidence that Apple attempted to or could have limited or restricted his sister's access or control over the garage that she and her husband owned, Apple assumed the risk that his sister would consent to the search of the garage, and she had actual authority to consent. Even if Apple did have exclusive control over the garage, Amy Russell had apparent authority to give Chief Deputy Babcock consent to search because a reasonable person, given the information that Chief Deputy Babcock possessed, would believe that Amy Russell had joint control of the garage. That information included that Josh and Amy Russell were the sole owners of the property in question, that they maintained access to the garage, and that they stored personal property there. There was no indication that Apple had restricted them from going into the garage, in fact, the door was unlocked at the time the search occurred. Given this information, there was no reason for the officers to further inquire as to whether the consent Amy Russell provided was valid. Relying on Amy Russell's consent was reasonable and therefore, the officers did not need a search warrant to conduct a reasonable search of the garage. There is no evidence that Amy Russell's consent was coerced.

Even if the consent Amy Russell provided was invalid, Chief Deputy Babcock and Detective Lynch were justified in entering the garage for a limited warrantless search based on probable cause to believe that a methamphetamine production operation was ongoing and the exigent circumstance that an ongoing methamphetamine operation produces. An odor associated with the production of methamphetamines was emanating from the garage. Items outside of the garage in a wooded area associated with the production of methamphetamines were observed prior to entry into the garage. People were living in close proximity to the meth lab and meth labs create an immediate danger to those in close proximity due to the volatility of the chemicals involved in the manufacturing process.

The ISP Defendants are entitled to summary judgment for the same reasons as the Orange County Defendants – that being that Apple's constitutional rights were not violated when the garage was searched. In addition, Sergeant Andry and Detective Magill reasonably relied upon the information imparted to them in making the determination that the owners of the garage had consented to its search. Based upon this collective knowledge, Sergeant Andry and Detective Magill entered the garage to investigate the illegal laboratory in the garage and dismantle it. "[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Hensley*, 469 U.S. 231(1985) (quoted by *U.S. v. Parra*, 402 F.3d 752 (7th Cir. 2005)). Sergeant Andry and Detective Magill made no observations that would dispel this knowledge imparted to them.

### D. False Arrest

If Apple intended to assert a claim of false arrest or false imprisonment in his complaint, such claims appear to have been abandoned.  It is clear that had such claims been asserted that they would not survive summary judgment for the following reasons. First the plaintiff's arrest was objectively reasonable. See *Graham v. Connor*, 490 U.S. 386, 388 (1989). An officer has probable cause to arrest and detain an individual when the facts and circumstances within his knowledge and reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 433 (7th Cir. 1993)(citation omitted). Apple does not claim that he was arrested and imprisoned in the absence of probable cause, nor could he reasonably in light of the ample evidence indicating probable cause existed believe he had committed a crime. Apple also does not claim that any of the individual defendants directly participated in his arrest and imprisonment, a requirement under Section 1983. For these reasons, he fails to state a claim of false arrest or imprisonment against the defendants.

### E. Policy or Custom

Claims against Sheriff Richard Dixon, in his official capacity, must be dismissed because there is no evidence that there was a policy, practice or custom in Orange County, Indiana that violated Apple's constitutional rights.

## IV. Conclusion

Because Chief Deputy Babcock and Detective Lynch had consent to search the Russell's garage and exigent circumstances existed justifying the search, there was no constitutional violation occasioned by Detective Lynch or Chief Deputy Babcock. Detective Lynch and Chief Deputy Babcock did not violate the Plaintiff's constitutional rights on October 11, 2007, and therefore these individuals are entitled to qualified immunity. Claims against Sheriff Dixon in his official capacity are dismissed because there is no evidence that a policy or practice of the Orange County Sheriff Department violated Apple's constitutional rights. Accordingly, **the Orange County Defendants' Motion for Summary Judgment (dkt 45) is granted.**

Similarly, because Detective Magill and Sergeant Andry did not violate Apple's constitutional rights on October 11, 2007, they are entitled to qualified immunity. Accordingly, **the ISP Defendants' Motion for Summary Judgment (dkt 55) is granted.**

Judgment consistent with this Entry shall be entered.

**IT IS SO ORDERED.**

Date: 8/12/2010

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana